## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SADE E. SWINT | : CIVIL ACTION |
| | : |
| v. | : NO.  23-3869 |
| | : |
| VITAS HEALTHCARE ATLANTIC | : |
| CORPORATION | : |

## MEMORANDUM

**MURPHY, J.**                                                        **May 12, 2026**

This is an employment discrimination case.  For three years, Sade Swint worked at Vitas Healthcare Atlantic Corporation, a healthcare company that provides hospice and palliative services, including at-home care, to patients.  She served in several roles: Registered Nurse with on-call duties, on-call weekend triage manager, daytime visiting nurse, and *per diem* (*i.e.*, as-needed) Admission Nurse, among others.  Ms. Swint suffers from narcolepsy with cataplexy, and she took leave for her condition pursuant to the Family and Medical Leave Act (FMLA).  Throughout her time with Vitas, she also requested accommodations for her disability.  That resulted in Ms. Swint shifting into different roles at Vitas in an apparent attempt to accommodate her narcolepsy-related needs.  Months later, frustrated, Ms. Swint resigned.  She now seeks relief for what she views as Vitas's refusal to provide her with reasonable accommodations and its discrimination against her based on her disability, race, and sex.  But Vitas had a legitimate, nondiscriminatory reason for its actions: that Ms. Swint was not able to perform the essential functions of the various roles she held or sought.  Ms. Swint did not adduce evidence that would allow a reasonable jury to disagree.  Nor is there sufficient evidence to support a finding of race or sex-based discrimination against Ms. Swint.  Thus, we grant Vitas's summary judgment motion in full.

## I.    BACKGROUND

Ms. Swint brings claims of disability, race, and sex discrimination against Vitas under the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act (Title VII), Equal Pay Act (EPA), and Pennsylvania Human Relations Act (PHRA).  DI 26 at 9-13.  On January 11, 2021, Ms. Swint began working for Vitas as an RN with on-call duties.  DI 80 at ¶ 3.  As part of her application to Vitas, which Vitas asserts is for the Equal Employment Opportunity Commission's (EEOC) purposes and is not viewed by Vitas management,[1] Ms. Swint disclosed that she had a disability (though the disclosure did not specify the particular disability).  *Id.* at ¶ 4.  Before her hiring, Ms. Swint told Melissa Noel, a Vitas employee, that she did not require accommodations for her irritable bowel syndrome (IBS).  *Id.*  Ms. Swint was promoted to Team Manager Triage (otherwise referred to as Manager On Call) as of May 7, 2021.  *Id.* at ¶ 5.  The parties dispute the specific duties formally required of the Team Manager Triage role,[2] but they

---

[1] DI 80-1 at 111.  Though Ms. Swint contends that she effectively disclosed her disabilities to Vitas by designating that she had a disability in her employment application, she does not dispute that this sheet is used for EEOC purposes but rather asserts that a member of Vitas's human resources department either knew or should have known of her disclosure, or identified this disclosure when she requested reasonable accommodations.  DI 80 at ¶ 4; DI 85-1 at 10 n.2.

[2] The parties' joint exhibits submission includes an exhibit titled "Policy Manual" which includes the job description and duties for "Team Manager" and is dated August 23, 2023.  DI 80-1 at 26-32.  Ms. Swint disputes that this is the correct policy manual and claims that the operative manual, instead, was dated February 3, 2022.  DI 80 at ¶ 7.  However, she did not include the February 3 policy manual in the joint exhibits, in her exhibits attached to her response in opposition to the motion for summary judgment, or even in her previously filed exhibits before the summary judgment stage.  Thus, the only policy manual we have before us is the 2023 manual.  Also included in the joint exhibits is a May 12, 2021 email from Vitas employee Gina Lewis to Ms. Swint, in which she provided a narrowed list of tasks performed by the Team Manager Triage on the weekends, which are administrative in nature.  DI 80-1 at 82.

2

do not dispute that Ms. Swint was assigned to cover in-person shifts in that position. *Id.* at ¶¶ 7-8. On March 20, 2022, Ms. Swint emailed her supervisor, Ms. Noel, stating — under the subject line "Voluntary Demotion" — that the Team Manager Triage role was "overly stressful" and "unbearable" due to the "manipulating and calculating" conduct of her coworkers on her team and the "very ineffective" process for handling coverage needs. DI 80-1 at 38. She closed by asking to discuss "other possibilities or a mixed schedule" and the possibility of working "every other weekend or hav[ing] every 3rd weekend off" and/or having "a counterpart" because she "really need[ed] a reprieve" and her "kids need[ed] at least one weekend" with her. *Id.* She did not mention any disability or discrimination against her in this email.

On April 5, 2022, Ms. Swint again emailed Ms. Noel, describing communications issues with the nurses on her team and requesting a change in position, such as becoming the Team Manager – 652 or a *per diem* nurse (PRN). *Id.* at 41. She mentioned that her position "is not good for [her] mental health" but did not mention any disability or discrimination against her. *Id.* at 42. Ms. Noel replied that day, stating that she was sorry to hear that Ms. Swint was unsatisfied in her position and that she and the General Manager for Vitas's Philadelphia Program, Tom Mignone, would discuss her concerns and devise a plan. DI 80 at ¶ 14.

Around May 3, 2022, Ms. Swint provided Vitas with a note from her doctor, in which her doctor requested that she refrain from shift work due to her narcolepsy and cataplexy and that she be allowed to work remotely. *Id.* at ¶ 15. Vitas insists that this was the first time that Ms. Swint disclosed her narcolepsy and cataplexy to any member of Vitas management, while Ms. Swint asserts that she disclosed her disability to a supervisor, James Austin (otherwise known as "Sam" in the record), prior to October 2021 — though she provides no citation for this

3

assertion.[3]  *Id.*  From our review of the record, other than Ms. Swint's statements in her deposition, her statement in her resignation letter to Vitas employee Ava Padmore-Lewis, and her email to Vitas employee Diane Psaras on October 13, 2022, no evidence indicates that Ms. Swint informed management that she had narcolepsy with cataplexy prior to May 3, 2022.  DI 80-1 at 71, 111; DI 85-1 at 60.

 Ms. Swint then moved into a daytime, non-management, RN position, in which she worked four days per week and would be responsible for covering visits and admissions.  DI 85-1 at 175-76.  On July 29, 2022, Ms. Swint emailed Mr. Mignone, informing him that she had narcolepsy with cataplexy and requesting a workplace accommodation for those conditions.  DI 80-1 at ¶ 18.  At that point, Ms. Swint (according to her email) had been working 12 hours, 3 times per week, with 7 patient visits per shift.  DI 80-1 at 51.  In her email, she stated that she "really need[ed] a hybrid style role" where she received visits earlier in the day, due to the "excessive daytime sleepiness" and other symptoms she experiences when she is unable to maintain good sleep hygiene and is having negative interactions with others.  *Id.* at 51-52.  Mr.

---

[3] Ms. Swint asserts that in her October 28, 2021 email to Mr. Austin, she provided a copy of a doctor's note discussing the need for a disability-based accommodation request.  DI 80 at ¶ 15 (citing DI 85-1 at 53-57).  However, this email — which is dated December 28, 2021 — does not include, nor even mention, a doctor's note regarding a disability-based accommodation request.  It includes no reference to a disability and instead consists of Ms. Swint's concerns regarding her responsibilities, after-hours staffing, and Vitas's culture.  *Id.* at 54.  Ms. Swint further states, again without citation to the record, that she followed up on her conversation with Mr. Austin at various times regarding her disability but that no action was taken until May 3, 2022.  DI 80 at ¶ 15.  She also claims that she disclosed her disability to Ms. Noel and Mr. Mignone in approximately March 2021 when she interviewed for the Team Manager Triage role.  *Id.* (citing 80-1 at 37-38, 109-10, 113-16).  Though the joint exhibits include a September 28, 2020 note from her doctor stating that she was unable to work night shifts due to her narcolepsy, this note (which is addressed "To Whom It May Concern") was written prior to her employment at Vitas and there is no indication in the record that it was shared with Vitas.  DI 80-1 at 133.

Mignone responded that same day, informing Ms. Swint that he would contact Ms. Noel regarding her concerns.  DI 80 at ¶ 19.  The next day, Ms. Swint emailed Ms. Noel and Mr. Mignone, again stating that her condition was being exacerbated by having to see seven patients in multiple zip codes, being forced to complete tasks from the prior day, and going to bed past 10 p.m. because she had remaining work from the day to complete.  DI 85-1 at 143.  She thus asked for an accommodation to see seven patients per day or to be an AN assigned to Bucks County/Northeast Philadelphia on Monday-Wednesday from 8 a.m. to 8 p.m., such that she had the necessary flexibility and autonomy to do her job and manage her symptoms and health.  *Id.* Two days later, Ms. Swint emailed Ms. Noel, again requesting an accommodation and providing the following as possible accommodations: (1) scheduling all visits for a day within 1-2 neighboring zip codes; (2) providing advanced notice of visits and needs for the week; (3) scheduling all visits between 10 a.m. and 5:30 p.m.; and (4) giving her the time and ability to complete documentation outside of the visit, review patients' information and conduct follow up, and finish work during her working hours.  DI 80-1 at 54-56.

Instead of granting Ms. Swint's accommodations request, Ms. Swint was placed on FMLA leave until approximately September 7, 2022.  DI 80 at ¶ 21.  Ms. Swint asserts that she did not request FMLA leave, but that Vitas initiated FMLA on her behalf (and forced her into it) after she asked for accommodations.[4]  *Id.*

From September 7 to September 22, Ms. Swint texted with Mr. Austin about the steps she

---

[4] Other than Ms. Swint's statements in the joint statement of facts and in her resignation letter to Ms. Padmore, DI 80-1 at 73, there is no evidence in the record that Ms. Swint was forced to take FMLA leave.

needed to take to move into the *per diem* role, stating that she would "work as needed or part[time] during the week, but [she would] need to know how [she is] to initiate a work day" and that she "need[ed] to maintain a schedule which would fit being part-time." DI 85-1 at 111-18. Around September 21, 2022, Ms. Padmore-Lewis, Mr. Mignone, and Mr. Noel met with Ms. Swint to discuss her return to Vitas and accommodations requests. DI 80 at ¶ 22. In an email Ms. Swint sent to them that same day, following the meeting, Ms. Swint attached a physician certification documenting her scheduling and flexibility needs and stated that she (1) would like to begin working a reduced schedule; (2) could work a reduced schedule to allow her the flexibility she needed to self[-]manage; and (3) "acknowledge[d] that a position [could] not be made up and that [Vitas] [could] not provide remote work." *Id.* at ¶ 23; DI 80-1 at 58. Vitas then offered Ms. Swint a position as a *per diem* AN, which included reduced hours. DI 80 at ¶ 24. Ms. Swint declined this position on September 23, noting that it required "the essential functions of driving and attending appointments without accommodation while on the job" and that her "physician did not clear [her] of all restrictions." *Id.* at ¶ 24; DI 80-1 at 60. She further referenced that the Team Manager – 652 position she previously worked provided her with "the flexibility in starting from home, working in the office, or [working] remotely to maintain [her] condition" and "allowed [her] to be accommodated." DI 80-1 at 60. And she expressed that an as-needed position "[did] not guarantee there [would] be work available." *Id.* However, on October 4, 2022, Ms. Swint accepted this very position, acknowledging that she "would be contacted daily with admission needs and availability" and that she "would be given the flexibility to not take appointments [she could] not fully complete based on [the] time of day and symptomology." DI 80 at ¶ 24; DI 85-1 at 157.

In February 2023, Ms. Swint informed Mr. Mignone via email that she could not drive to patient appointments, which was an essential function of her job as an Admission Nurse.  DI 80 at ¶ 25; DI 80-1 at 64-65.  In her February 17 email, she acknowledged that the role required "travel to timed appointments anywhere in the program's coverage area" but stated that her "restrictions include[d] driving and flexibility" and that those "restrictions were blatantly ignored."  DI 80-1 at 64-65.  Mr. Mignone responded six days later, noting her acceptance of this position, failure to respond to all work requests with her availability, and seeming inability "to perform the essential functions of any of the jobs [Vitas has] offered."  *Id.* at 63-64; DI 80 at ¶ 26.  He stated that Vitas "cannot remove essential functions of any of the jobs [it has]" and that it appeared that Ms. Swint wanted "to accept some essential functions of the jobs [she] held while disregarding others" but "[t]hat is not the way accommodations work."  DI 80-1 at 64.  He then asked Ms. Swint whether she intended to accept any *per diem* work when it was offered and stated that "[t]here are any number of other positions [she] can apply for but [she] must be able to perform all of the essential functions of the job [she] select[s] with or without a reasonable accommodation."  *Id.*  Mr. Mignone asked Ms. Swint to advise him of her intentions by February 27.  *Id.*  On that day, Ms. Swint responded, stating that she (1) did not accept the as-needed AN position in the email that he referenced and "was not given a choice" because "[t]here were no other positions offered besides a position in [New Jesey] that required extensive driving[;]" (2) previously informed him that this position did not accommodate her and was thus unacceptable; and (3) despite being assured by him that work was always available, was not scheduled when she provided her availability.  *Id.* at 63.

The next day, Mr. Mignone informed Ms. Swint that Vitas had multiple positions

available to her and that it would be willing to remove marginal, but could not remove essential, functions from any position she selected. DI 80 at ¶ 27. He asked her to identify which position she would like to pursue and which marginal functions she would like to remove. *Id.* On March 7, 2023, Ms. Swint sent a letter of resignation to Ms. Padmore. DI 80-1 at 70-74. She referenced harassment and bullying from triage nurses, resulting in extra demands on her to conduct patient visits and to work forced overtime, her request to be moved into a then-open position as a "home team manager" (seemingly the Team Manager – 652 position) for which someone else ended up being hired, and the lack of accommodations for her restrictions in the AN position. *Id.* Ms. Swint concluded by stating that she had "no choice" but to resign and had "not been given an option[,]" asserting that "[t]here ha[d] been no willingness to accommodate [her] disability" and that she had "only met opposition in all [her] efforts." *Id.* at 74.

On October 3, 2023, Ms. Swint filed for relief in this court. DI 2. Her fourth, and operative, amended complaint seeks relief under the ADA, Title VII, PHRA, and EPA. DI 26. Magistrate Judge Lynne A. Sitarski conducted a settlement conference with the parties on June 6, 2024, which did not result in settlement. DI 32. The parties then participated in arbitration in February 2025, which resulted in a judgment in Vitas's favor. DI 59. We confirmed this arbitration award on April 4, 2025, after neither party filed timely objections to it. DI 62. That day, Ms. Swint filed for reconsideration, appealing the award and requesting that we reopen the matter. DI 63. We granted Ms. Swint's motion for reconsideration and reopened this case on September 24, 2025. DI 72. Now, Vitas seeks summary judgment on all claims. DI 81.

## II.    MOTION AT ISSUE

Vitas moves for summary judgment, DI 81, arguing that Ms. Swint cannot prove her

discrimination or retaliation claims under the ADA, PHRA, or Title VII, nor her EPA claim. DI 82 at 5-6. It insists that Ms. Swint cannot establish a *prima facie* case for her disability-based discrimination, failure to accommodate, and unequal pay claims. DI 82 at 7. Vitas contends that Ms. Swint failed to show that she was a qualified individual with a disability because the record demonstrates that she was unable to perform the essential functions of her positions with Vitas, with or without reasonable accommodations. *Id.* at 8-9. It insists that her various requests for changes in her positions were not requests for reasonable accommodations because she essentially asked to remove essential functions of those positions.[5] *Id.* at 10-11. Nor, Vitas maintains, did Ms. Swint suffer any adverse employment action due to her disability because she requested demotions and position changes, and then resigned. *Id.* at 12. Moreover, Vitas argues that there is no evidence indicating, let alone proving, that her disabilities were a motivating factor in any adverse employment actions against her, highlighting Vitas's efforts to allow her to work a reduced schedule, change positions, and eliminate marginal job functions from her roles. *Id.* at 14. And Vitas contends that it established a legitimate non-discriminatory reason (LNDR) for its employment decisions respecting Ms. Swint (which she has not successfully rebutted): that she was unable to perform the essential functions of her positions. *Id.* at 14-15.

As for her Title VII race and gender discrimination claims, Vitas asserts that these should

---

[5] Vitas emphasizes that an essential function of the Team Manager was "the ability to work flexible in-person shifts" such that employees in that role could not pick and choose which weekends to work. DI 82 at 9. It further argues that her request for a counterpart in that role was not a reasonable accommodation request, given that in-person, flexible shift work is required for that position. *Id.* Nor, Vitas implies, was her request as a daytime visiting nurse to conduct visits only in close proximity to one another and only between 10 a.m. and 5:30 p.m. a reasonable accommodation request, given the demands of that job (*i.e.*, 12-hour shifts). *Id.* at 11. And, as a *per diem* nurse, Vitas avers that this role required driving to patient appointments and having flexibility regarding the timing, and notice of, those appointments. *Id.*; DI 86 at 8.

9

be dismissed because (1) Ms. Swint was unqualified for her positions; (2) Ms. Swint did not suffer an adverse employment action; and (3) there is no evidence that any adverse employment actions were motivated by sex or race discrimination, nor that there was any race or sex-based discrimination against her at all. *Id.* at 15-16. Vitas highlights the lack of evidence that she was compensated less than others working similar positions or possessing similar qualifications, nor any evidence indicating who those people were. *Id.* at 16. And, again, Vitas asserts it had an LNDR for its actions. *Id.* at 17. Moreover, because her PHRA claims mirror her ADA and Title VII claims, Vitas insists that her PHRA claims likewise fail. *Id.* at 19-20. Given the lack of evidence of any adverse employment action against Ms. Swint, or causal connection between any such action and protected activity, Vitas avers that Ms. Swint's retaliation claim must fail. *Id.* at 17-18. In Vitas's view, Ms. Swint's conclusory allegations are insufficient to withstand summary judgment. DI 86 at 2-4.

Finally, Vitas argues that the record is devoid of evidence to support any EPA claim. DI 82 at 19. It insists that there is no evidence that Ms. Swint was paid unequally compared to similarly situated male coworkers. *Id.* Vitas further avers that there is no evidence regarding which, if any, individuals received bonuses or different compensation compared to Ms. Swint, let alone evidence "that a male or a white employee was treated better than [her] in similar circumstances." DI 86 at 7.

Ms. Swint responds that there are genuine issues of material fact regarding each of her claims, such that summary judgment is inappropriate. DI 85-1 at 6, 19. Regarding her disability-based claims, she asserts that the evidence sufficiently establishes that she had a disability, of which Vitas was notified. *Id.* at 20-21. Ms. Swint insists that it also establishes

that she was qualified to perform the essential function of four positions with and without reasonable accommodations: (1) on-call home care RN (given that she was promoted to a manager position shortly after beginning this role); (2) Manager on Call (given that she was offered this role despite disclosing her disability); (3) Team Manager – 652 (given that this position met her reasonable accommodation request needs and that Vitas replaced her with a different employee); and (4) RN (given that Vitas placed her in this role while aware of her disability-related needs). *Id.* at 21-23. In her view, Vitas failed to provide her reasonable accommodations[6] by rejecting her request that she be allowed to schedule her own patient visits when she was working as an RN, involuntarily placed her on FMLA leave, and subsequently put her in a *per diem* position, after which she was "constructively terminated" and decided to resign. *Id.* at 3; DI 85-1 at 15. Nor, Ms. Swint maintains, did Vitas engage in an interactive process to discuss reasonable accommodations (other than simply noting that she could sleep at night) (1) while she was the Manager on Call; (2) when she disclosed issues that were exacerbating her disability in July, September, October, and December of 2021 to management; (3) when she was placed on and returned from FMLA leave; and (4) when she attempted to establish structure in her *per diem* schedule. DI 85-1 at 23-24. Ms. Swint also contends that Vitas never followed up on its findings and recommendations after she filed a complaint with the Human Resources Director, Diane Psaras, nor took any action regarding this. DI 85-1 at 16.

As for retaliation, Ms. Swint asserts that the record shows that Vitas retaliated against her

---

[6] Ms. Swint also argues that the "Team Manager – 652" position, which she purportedly performed for three months beginning in March 2022, "was constructively the reasonable accommodation [she] had been requesting" as it was "a Monday to Friday, '9 to 5' position." DI 85 at 3.

by involuntary placing her on FMLA leave and failing to (1) provide her the reasonable accommodations she requested; (2) inform her that the Team Manager – 652 position was open for applications and instead removing her from that position; (3) provide her full-time employment upon her return from FMLA leave; and (4) offer her reasonable accommodations in her *per diem* position, resulting in her constructive termination. *Id.* at 25.  She argues that her request for reasonable accommodations constituted protected employee activity and that Vitas's transition of her to the RN position from the Team Manager – 652 position, and then to the *per diem* position, constituted a temporally proximate, and thus retaliatory, change in the conditions and privileges of her employment. *Id.* at 26-28.

Finally, regarding her race and sex discrimination claims, Ms. Swint asserts "that her race was a factor in the harassment, bullying, intimidation, insults, and the dismissal of her concerns by her colleagues, but more so that [Vitas] did nothing to quell the behavior." *Id.* at 28.  She argues that she has met her *prima facie* burden based on evidence regarding (1) her status in a protected class; (2) her qualification to perform the essential functions of the positions; (3) Vitas's failure to stop her colleagues' bullying, intimidation, harassment, insults, and dismissal of her concerns, and Vitas's lack of response thereto; and (4) Vitas's continued adverse employment decisions. *Id.* at 28-30.  In her view, the "very nature" of such evidence "demonstrate[s] the weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Vitas]'s" proffered LNDR. *Id.* at 30.  She offers no specific argument regarding her sex discrimination claim beyond asserting that she is in a protected class "[a]s an African American woman."[7] *Id.* at 29.

---

[7] Her discussion of her status as an African American woman is fully encompassed in her

12

### III.    LEGAL STANDARDS

### A.    Summary judgment

Summary judgment is warranted when the movant demonstrates "that there is no genuine dispute as to any material fact" such that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact is "any reasonable disagreement over an outcome-determinative fact."  *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021) (citation omitted).  When evaluating a summary judgment motion, we must "view the record and draw inferences in a light most favorable to the non-moving party."  *In re IKON Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citation omitted).  We also must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The non-moving party's evidence need not be conclusive to survive summary judgment.  *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 217 (3d Cir. 2002).  Though "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment[,]" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citation omitted), "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment[,]" *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320 (3d Cir. 2014) (citation omitted).  We apply the summary judgment standard in employment discrimination cases "with added rigor" because they often hinge upon credibility and intent.  *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (citation omitted).

### B.    Americans with Disabilities Act (ADA)

---

subsection titled, "Plaintiff's Race Discrimination Claim."  *Id.* at 28-30.  There is no separate discussion of her sex discrimination claim.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  We apply the well-known *McDonnell Douglas*[8] burden-shifting framework to disparate treatment and retaliation claims under the ADA.  *Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir. 2000) (citations omitted).  There are three stages to this framework.  *Id.* (citations omitted).

Step one requires that the plaintiff establish a *prima facie* case — either of disparate treatment or retaliation, depending upon the nature of the ADA claim.  *See id.*  To establish a *prima facie* case of disparate treatment, the plaintiff must demonstrate that she (1) is disabled as defined by the ADA; (2) is otherwise qualified to perform the job's essential functions, with or without reasonable accommodations from her employer; and (3) suffered an adverse employment action due to discrimination.  *Id.* (citations omitted).  In contrast, establishing a *prima facie* case of retaliation requires the plaintiff to show that (1) she engaged in protected employee activity; (2) the employer took adverse action against her, either after or contemporaneous with that protected activity; and (3) the protected activity and adverse action are causally related.  *Id.* (citations omitted).  Her burden in proving a *prima facie* case is not "onerous."  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728-29 (3d Cir. 1995) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also id.* (explaining that a *prima facie* case "merely 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

factors.'") (citing *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577 (1978)).

If the plaintiff-employee succeeds in doing so, then the burden shifts to the defendant-employer, who must articulate a legitimate nondiscriminatory reason (LNDR) for its adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citation omitted). This is a fairly light burden: the employer simply must present evidence which, construed as true, would enable the factfinder to determine that the employer had a nondiscriminatory reason for its action. *Id.* (citations omitted). "The employer need not prove that the tendered reason actually motivated its behavior[.]" *Id.* (citation omitted). Then, if the defendant-employer succeeds in articulating an LNDR, the plaintiff-employee must prove, by a preponderance of the evidence, that the proffered LNDR was mere "pretext for discrimination." *Id.*; *Shaner*, 204 F.3d at 500-01 (citations omitted). At all times, the plaintiff carries "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Shaner*, 500-01 (citation omitted). At the summary judgment stage, we evaluate whether there is sufficient evidence for a jury to conclude that the defendant's purported reasons for its adverse employment actions constitute pretext for intentional discrimination. *Id.* at 501 (citation omitted). To defeat summary judgment, a plaintiff must point to some direct or circumstantial evidence from which a factfinder reasonably would either (1) disbelieve the employer's proffered LNDR; or (2) believe that, more likely than not, an invidious discriminatory reason was a motivating or determinative cause of its action. *Id.* (citing *Fuentes*, 32 F.3d at 764; *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 2000)). It is not enough simply to show that the employer's action was mistaken or wrong; "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

15

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citing *Fuentes*, 32 F.3d at 765). "The plaintiff must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason. . . . The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006) (citation modified).

**C.   Title VII of the Civil Rights Act of 1964**

Title VII forbids employers from discriminating against any individual regarding her terms, conditions, compensation, or employment privileges, or otherwise adversely affecting her status as an employee, because of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). We utilize the same *McDonnell Douglas* burden-shifting test discussed above in determining whether an employer intentionally discriminated against its employee under Title VII.[9] Steps two and three (regarding articulating and rebutting an LNDR for the employment action) are the same as the steps detailed above. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Step one is slightly different: to establish a *prima facie* case, the plaintiff must establish that (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she experienced an adverse employment action; and (4) the circumstances of that action could give rise to an inference of intentional discrimination. *Id.* (citations omitted). Again, plaintiff's burden in establishing a *prima face* case is not high. *Sempier*, 45 F.3d at 728-29. Although a plaintiff's subjective belief that race impacted an employment decision is insufficient to

---

[9] *See supra* at 14-16.

16

demonstrate an inference of discrimination, we may infer discrimination from the employer's more favorable treatment of a similarly situated employee who is outside of the employee's protected class. *Rodriguez v. AMTRAK*, 532 Fed. Appx. 152, 153 (3d Cir. 2013) (citing *Jones v. Sch. Dist.*, 198 F.3d 403, 410-11 (3d Cir. 1999), *abrogated on other grounds as recognized by Russo v. Bryn Mawr Tr. Co.*, 2024 WL 3738643, at *4 n.3 (3d Cir. Aug. 9, 2024)).[10]  When evaluating whether an individual is similarly situated for Title VII purposes in a case involving discipline or personnel actions, relevant considerations often include establishing that the two employees (1) worked with the same supervisor; (2) were subjected to the same standards; and (3) engaged in similar conduct without mitigating or differentiating circumstances that distinguished their conduct or employer's treatment of them. *Houston v. Easton Area Sch. Dist.*, 355 Fed. Appx. 651, 654 (3d Cir. 2009) (citations omitted).  Whether an individual is similarly situated is a factual question for the jury to answer, but we may "grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiff[] were similarly situated." *Hampshire v. Bard*, 793 Fed. Appx. 75, 80 (3d Cir. 2019) (citation omitted).

### D.    Pennsylvania Human Relations Act (PHRA)

The PHRA prohibits employers from discriminating against their employees with respect to their employment terms or discharge, conditions, or privileges on the basis of the employees' "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal . . . ." 43 P.S. § 955(a).  "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something

---

[10] The *Russo* Court explained that *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), "arguably abrogated *Jones*" with respect to what might constitute adverse employment action. *Russo*, 2024 WL 3738643, at *4 n.3.

17

specifically different in its language requiring that it be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) (citation omitted). "Claims under the PHRA are interpreted coextensively with Title VII claims[,]" *Atkinson*, 460 F.3d at 454 n.6 (citation omitted), as well as ADA claims, *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996), *superseded by statute on other grounds as recognized by Wilders v. Quikrete Companies, Inc.*, 2019 WL 1128629, at *4 (W.D. Pa. Mar. 12, 2019). *See also Silla v. Holdings Acquisition Co., L.P.*, 2025 WL 1680450, at *2 n.2 (3d Cir. June 16, 2025) (stating that the district court correctly treated plaintiff's PHRA claims "as coextensive with her Title VII and ADA claims and rejected them on like grounds[.]") (citations omitted). We thus apply the same *McDonnell Douglas* test used for ADA and Title VII claims to evaluate PHRA claims. *Atkinson*, 460 F.3d at 454 (applying *McDonnell Douglas* to Title VII and PHRA claims); *Castellani v. Bucks County Municipality*, 351 Fed. Appx. 774, 776-77 (3d Cir. 2009) (applying *McDonnell Douglas* to ADA and PHRA claims).

### E.     Equal Pay Act (EPA)

The Equal Pay Act prohibits employers from discriminating "between employees on the basis of sex by paying [unequal] wages . . . to employees of the opposite sex in such establishment for equal work." 29 U.S.C. § 206(d)(1). We utilize a two-step burden-shifting test for EPA claims. *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000). First, the plaintiff must establish a *prima facie* case by showing that employees of the opposite sex were paid differently for equal work, where "equal work" is "work of substantially equal skill, effort and responsibility, under similar working conditions." *Id.* (citation omitted). If the plaintiff succeeds in establishing a *prima facie* case, then the burden of persuasion shifts to the employer to prove that one of the four affirmative defenses in the EPA applies. *Id.* (citation omitted). The

18

employer carries the burden of ultimate persuasion such that, to win summary judgment in its favor, it "must prove at least one affirmative defense 'so clearly that no rational jury could find to the contrary.'" *Id.* at 107 (citation omitted). These affirmative defenses include when differential payment results from a (1) seniority system; (2) merit system; (3) system measuring earnings by quality or quantity of production; or (4) differential based on any factor other than sex. 29 U.S.C. § 206(d)(1); *see also Puchakjian v. Twp. of Winslow*, 520 Fed. Appx. 73, 76 (3d Cir. 2013) (citation omitted). This requires that the employer "produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Stanziale*, 200 F.3d at 107-08.

## IV.  DISCUSSION

### A.  We grant summary judgment for Vitas on Ms. Swint's ADA claim because Ms. Swint cannot rebut Vitas's LNDR for its employment actions

Summary judgment in Vitas's favor is warranted because Vitas had a legitimate, nondiscriminatory reason for its employment decisions regarding Ms. Swint, and Ms. Swint has not shown that this reason was mere pretext for discrimination. Ms. Swint brings disparate treatment and retaliation claims under the ADA. DI 26 at 1-2, 8-9; DI 85-1 at 20-28. On both claims, she meets the first prong required to establish a *prima facie* case,[11] as the evidence sufficiently establishes that she (1) had a disability — narcolepsy with cataplexy — of which Vitas was notified at least as of May 3, 2022 (relevant to her disparate treatment claim); and (2) engaged in protected activity through her request for accommodations, use of FMLA leave, and filing of an internal grievance and complaint with the Equal Employment Opportunity

---

[11] *See Shaner*, 204 F.3d at 500.

Commission (EEOC) regarding Vitas's alleged failure to provide her with reasonable accommodations (relevant to her retaliation claim).[12] DI 80 at ¶¶ 11, 13, 15; DI 85 at 4 (citing DI 2); DI 85-1 at 65-68, 76-78, 90-92, 184-86; *see also Shellenberger v. Summit Bancorp*, 318 F.3d 183, 184, 187-91 (3d Cir. 2003) (explaining that requesting a reasonable accommodation for a disability and filing with the EEOC a charge of discrimination is protected activity under the ADA). The heart of the dispute thus is (1) whether Ms. Swint was qualified to perform the essential functions of the jobs in question, with or without reasonable accommodations; (2) whether Vitas took adverse employment action against her; and (3) whether that adverse action was causally linked to her protected activity.

We assume, without deciding, that Ms. Swint has done enough to establish a *prima facie* case of disparate treatment and retaliation, largely based on material questions of fact regarding her possible time serving in the Team Manager – 652 position. DI 85 at 3; DI 86 at 6 (acknowledging, and not clearly disputing, Ms. Swint's claim that she worked in this position prior to being moved to a daytime visiting nurse role); DI 85-1 at 66 (stating in Vitas's human resources grievance investigation that, according to Mr. Mignone, Ms. Swint was not covering the Team Manager – 652 position); *see also* DI 80-1 at 40-42 (requesting via email to Ms. Noel a switch to the Team Manager – 652 position if it was an option). We assume that there is a genuine question of material fact as to whether Ms. Swint (1) performed the Team Manager – 652 position; (2) was qualified to perform the essential functions of that position, with or without reasonable accommodations; and (3) was moved from that position, even though the position was available and might have accommodated her disability-related needs. The timing of Ms.

---

[12] Vitas does not refute that these actions constituted protected activity. DI 82 at 17.

Swint's doctor's note to Vitas's Human Resources Department regarding her symptomology and accommodation needs could presumably raise an inference of discrimination, as this note was sent on May 3, 2022, and there is a question of fact as to whether Ms. Swint was serving (or trying to serve) in the Team Manager – 652 position at this time.

The next step in our inquiry is to evaluate whether Vitas meets its relatively light burden of articulating a legitimate nondiscriminatory reason for any alleged adverse action[13] against Ms. Swint. Vitas clears this hurdle. It has presented evidence that would allow a jury to conclude that its reason for these decisions was Ms. Swint's inability to perform the essential functions of the various positions she held or tried to hold. *Fuentes*, 32 F.3d at 763; DI 82 at 14-15. The record is replete with communications between Ms. Swint and Vitas management discussing, and providing, various accommodations to Ms. Swint for her disability.[14] The record also includes clear communications from Vitas management to Ms. Swint that Vitas had several open positions available for her and would be willing to remove marginal functions from any of them to accommodate her, but that it could not remove essential functions. DI 80-1 at ¶¶ 26-27, 63-64. Moreover, the record illustrates that essential functions of the various roles Ms. Swint

---

[13] Such adverse action could include Vitas's possible transition of Ms. Swint to the RN role from the Team Manager – 652 position, its placement of her on FMLA leave, its placement of her on *per diem* status and purported failure to provide her with reasonable accommodations in this position, or Ms. Swint's assertion of constructive discharge). DI 85-1 at 25, 27-28, 30; *Fuentes*, 32 F.3d at 763.

[14] *See, e.g.*, DI 80-1 at ¶ 27 (asking Ms. Swint to identify which position she would like to pursue and offering to remove marginal functions from those jobs to accommodate her); DI 80-1 at 58 (suggesting in an email to Vitas that Vitas was allowing her to work a reduced schedule to have the flexibility she needed); DI 85-1 at 175 (transitioning Ms. Swint into the RN role and giving Ms. Swint her preferred shift start time); *Id.* at 157 (acknowledging Vitas let her transition to the AN position which would give her the needed flexibility based on her disability).

performed, which she expressed she could not perform, included (1) driving for many hours during each shift (including to multiple geographic areas); (2) performing in-person work, which also required the completion of documentation during the visit; and (3) receiving relatively little advance notice and having decreased flexibility in scheduling patient visits.  DI 80-1 at ¶¶ 26-27, 13, 19, 46, 60, 63-65.  This is enough to establish an LNDR for Vitas's actions regarding Ms. Swint.

We also conclude that Ms. Swint has not proven, by a preponderance of the evidence, that Vitas's proffered LNDR — her inability to perform the essential functions of the positions available to her — constituted mere "pretext for discrimination." *Fuentes*, 32 F.3d at 763.  Ms. Swint offers nearly no substantive argument to defeat Vitas's articulated LNDR regarding her ADA claim.  Rather, she asserts that (1) the record rebuts Vitas's claim that she was unqualified or suffered no adverse action because it shows that she "performed well when provided with even minimal stability[,]" such that (2) "the inconsistencies, incoherencies, or contradictions in [Vitas's] justification for replacing [Ms. Swint] in her management role and stripping her of full-time status suggest these reasons are a mere pretext for discrimination."  DI 85-1 at 31 (citation modified).  She does not point to direct or circumstantial evidence in the record that would allow a reasonable juror to (1) disbelieve Vitas's proffered LNDR; or (2) believe that, more likely than not, Vitas was motivated (determinatively or otherwise) by an invidious discriminatory motive in its actions toward Ms. Swint.  *Shaner*, 204 F.3d at 501 (citations omitted).  Nor does she demonstrate that Vitas's proffered LNDR contains "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Vitas's] proffered legitimate reasons for its action[s] that a reasonable factfinder could rationally find them unworthy of credence, and hence

22

infer that [Vitas] did not act for the asserted non-discriminatory reason[].” *Id.* (citation omitted).

Again, the record contains multiple examples of Ms. Swint (or her doctor) expressing the need

for accommodations such as remote work, reduced driving, flexibility with scheduling patient

visits, and advanced notice of patient visits, as well as multiple (and consistent) examples of

Vitas management explaining the essential functions of various roles throughout Ms. Swint’s

employment and why her accommodations requests would not enable her to fulfill those

functions.  DI 80-1 at ¶¶ 26-27 at 13, 19, 46, 60, 63-65.  It includes several instances where,

following such requests from Ms. Swint, Vitas moved Ms. Swint into a different position or

asked her to identify open positions that seemingly would better suit her disability-related

restrictions.  *Id.* at ¶¶ 17, 23-27, 58; DI 85-1 at 157, 175; DI 86-1 at 10-13.  And the record does

not demonstrate disability-based animus toward Ms. Swint.  At most, she (1) describes (in

various communications with management and her deposition) harassment, bullying, ridicule,

and dismissal from fellow staff, but she does not state nor imply that such conduct was related to

her disability; (2) states in an email to management that she is “frustrat[ed] with being

misunderstood and having [her] condition[,]” “feel[s] like [she is] being forced out[,]” and

ponders whether she hasn’t “clearly informed what [her] condition is[;]” and (3) states in a letter

to Vitas’s Human Resources Department that she “could barely speak about [her] disability

without an intense look from” Ms. Noel, her supervisor.  *See* DI 80-1 at 52, 70, 90, 107, 121.  On

this record, we do not believe that a jury could reasonably conclude that Vitas’s negative

assessment of Ms. Swint “was so plainly wrong that it cannot have been [Vitas’s] real reason”

for its employment actions respecting her and that, instead, disability-based discrimination was

“the real reason” for such actions.  *Atkinson*, 460 F.3d at 454.  Because Vitas articulated a

23

legitimate, non-discriminatory reason for its actions, of which Ms. Swint cannot rebut, Vitas is entitled to summary judgment on Ms. Swint's ADA claims.

**B.      Vitas is entitled to summary judgment on Ms. Swint's Title VII claims because Ms. Swint does not establish a *prima facie* case of race or sex-based discrimination**

We conclude that Ms. Swint has not established a *prima facie* case of discrimination based on race or sex, such that Vitas is entitled to summary judgment in its favor on her Title VII claims.  Even assuming that Ms. Swint satisfies the first three prongs of the *McDonnell Douglas* test — that she is a member of a protected class, was qualified for the position she sought to attain or retain, and experienced an adverse employment action — the record does not give rise to an inference of intentional race or sex-based discrimination.  *Makky*, 541 F.3d at 214 (citations omitted).  Nothing in the record points to discrimination based on race or sex; her race and sex are not even discussed in the numerous communications contained in this record.  Ms. Swint asserts that "the evidence suggests that her race was a factor in the harassment, bullying, intimidation, insults, and the dismissal of her concerns by her colleagues" and in Vitas's failure to do anything "to quell the behavior."  DI 85-1 at 28.  But she provides no citation to the record in support of this claim, and we find no such evidence in the record.  Moreover, Ms. Swint's subjective belief that race impacted Vitas's employment decisions is insufficient to demonstrate a discriminatory inference.  *Rodriguez*, 532 Fed. Appx. at 153 (citation omitted).  Nor does Ms. Swint identify any similarly situated employee who is outside of her protected class with respect to race or sex, so we cannot infer discrimination on the basis of the disparate treatment of similarly situated employees.  *Id*.

Even if Ms. Swint established a *prima facie* case, as explained above, we find that Vitas has articulated a legitimate, nondiscriminatory reason for its employment actions regarding Ms.

24

Swint: again, that she was unable to perform the essential functions of the positions available to her. DI 80-1 at ¶¶ 26-27, 13, 19, 46, 60, 63-65. We also conclude that Ms. Swint has not rebutted Vitas's LNDR, given (1) the lack of evidence pointed to by Ms. Swint, or contained in the record, regarding any race or sex-based discrimination against her; and (2) the many examples in the record indicating that Ms. Swint's accommodations requests would not enable her to fulfill the essential functions of the various roles she sought to attain or retain. *Id*. Ms. Swint cannot establish a *prima facie* case of Title VII discrimination, so we grant summary judgment in Vitas's favor on these claims.

**C.      We grant summary judgment for Vitas on Ms. Swint's PHRA claims because those claims are coextensive with her ADA and Title VII claims**

As Ms. Swint acknowledges, her PHRA, ADA, and Title VII claims all arise from the same factual bases. DI 85-1 at 24; *see also* DI 26 at 12-13. We interpret the PHRA coextensively with the ADA and Title VII. *Silla*, 2025 WL 1680450, at *2 n.2 (citing *Atkinson*, 460 F.3d at 454 n.6; *Kelly*, 94 F.3d at 105). Thus, for the same reasons that we grant summary judgment in Vitas's favor on Ms. Swint's ADA and Title VII claims, we likewise grant summary judgment for Vitas on her PHRA claims.

**D.      We grant summary judgment for Vitas on Ms. Swint's EPA claim because she has not established a *prima facie* case under the EPA**

Summary judgment is also warranted in Vitas's favor on Ms. Swint's EPA claim. Ms. Swint has not demonstrated that Vitas employees of the opposite sex were paid differently for equal work — again, she has not pointed to any employees of the opposite sex who performed similar, let alone equal, work. *Stanziale*, 200 F.3d at 107. Tellingly, her response in opposition to Vitas's summary judgment motion provides no argument in support of her EPA claim. DI 85.

25

At most, she includes her own assertions in the record that there were "differences in pay" and that "[o]ther managers were given a bonus for picking up extra [shifts] but [she] was not included as one of the managers who could be compensated for having done so" — without explaining what those payment differences were, who allegedly received such differential payment, or what those employees' responsibilities were. DI 85-1 at 12, 15 (citing DI 85-1 at 129, 188). Because she has not established a *prima facie* case under the EPA, we grant summary judgment for Vitas on this claim. *Stanziale*, 200 F.3d at 107.

## V.    CONCLUSION

For the reasons articulated above, we grant summary judgment for Vitas on all claims against it. As a threshold matter, Ms. Swint has not established a *prima facie* case for discrimination under Title VII or the EPA. Moreover, Vitas has articulated a legitimate, nondiscriminatory reason for its employment actions regarding Ms. Swint — which Ms. Swint has not rebutted — so her ADA, Title VII, and PHRA claims cannot survive summary judgment on this basis. Summary judgment in Vitas's favor therefore is warranted on all claims. An appropriate order accompanies this memorandum.